**Dawn DAWSON, Plaintiff–Appellant,**

v.

**BUMBLE & BUMBLE, Defendant–Appellee,**

**Docket No. 03–7180.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 25, 2004.

Decided: Feb. 17, 2005.

Rick Ostrove, Leeds Morelli & Brown, P.C., Carle Place, NY, for Plaintiff–Appellant Dawn Dawson.

Ellen M. Martin (Kathleen L. Jennings, on the brief), Patterson, Belknap, Webb & Tyler LLP, New York, NY, for Defendant–Appellee Bumble & Bumble.

Before: STRAUB, POOLER, and B.D. PARKER, Circuit Judges.

## BACKGROUND

POOLER, Circuit Judge:

This is an employment discrimination case. Plaintiff–Appellant Dawn Dawson, a self-described "lesbian female, who does not conform to gender norms in that she does not meet stereotyped expectations of femininity and may be perceived as more masculine than a stereotypical woman," claims that she suffered discrimination on the basis of sex, sex stereotyping, and/or sexual orientation in violation of federal, state, and municipal law. *See* Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.;* New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code, Title 8. Dawson's former employer, Defendant–Appellee Bumble & Bumble, describes itself as "a prestigious, high-end hair salon in Manhattan, known for its innovative hair cutting techniques."

Dawson was hired by Bumble & Bumble in early 1999 as a "hair assistant." Dawson describes the duties of this position as including "assisting [hair] stylists in all aspects of their jobs, keeping their work areas in the salon clean, escorting clients to different areas of the salon, shampooing clients' hair, and blow-drying clients' hair."

In addition to her duties as a hair assistant, Dawson was simultaneously enrolled in Bumble & Bumble's training program for hair stylists. As described by Bumble & Bumble, the program is a "rigorous" one:

An assistant must successfully complete, in succession, the Salon's basic blow-drying class, the basic scissor class, the basic razor class and spend some time in the advanced razor class.

Assistants in the basic cutting and razor classes are required to bring four models to each class. During class, the assistants practice consultation skills with each model and shampoo, cut and blow-dry their models' hair. An assistant's models must have the right kind of hair (in terms of length, texture and style) for the particular haircut on which the assistant is working, or the assistant will not be able to successfully perform the required haircut. Assistants must also properly use Bumble's haircutting techniques when performing the four haircuts. In order to move beyond the Salon's basic cutting class, assistants must complete to the satisfaction of their teachers four different haircuts: the bob, the graduated bob, long layers and short layers and demonstrate positive attitudes during their classes.

Dawson alleges in her complaint that she "was confident that she would be able

to graduate from the hair assistant training program to a stylist in an expedited fashion." We do not see, however, that Dawson disputes Bumble & Bumble's contention that "[o]nly about 10–15% of the total number of assistants at the Salon at any given time typically complete the educational program" and that it generally takes these successful candidates at least two and sometimes three years to complete the program.

The district court observed that the Bumble & Bumble salon is an unconventional workplace, a "heterogenous environment that strives for the avant garde and extols the unconventional." *Dawson v. Bumble & Bumble*, 246 F.Supp.2d 301, 311 (S.D.N.Y.2003). The district court also found that the salon's employees "embody many lifestyles and sexual preferences and reflect varying physical appearances, overall looks, and different manners of hair[,] dress and clothing." *Id.* at 310. Bumble & Bumble itself contends that "[i]f there is a 'norm' for Bumble employees, it is the norm of non-conformance." Thus, Bumble & Bumble asserts that the salon regularly employs "sexually 'non-stereotypical' individuals, including a female-to-male transsexual, [an] openly bisexual Education Coordinator, numerous other openly gay employees, and both male and female gay employees, including ... lesbian employees with very androgynous looks." The district court found it to be particularly significant that Connie Voines, the manager of the salon and the individual who ultimately decided to terminate Dawson, is "a pre-surgery male-to-female transsexual who ... at the time of the events in question, was transitioning from appearing male to appearing female." *Dawson*, 246 F.Supp.2d at 309.

Dawson does not seriously contest the depiction of the Bumble & Bumble salon as an environment in which conformance to gender norms was something less than a prerequisite for continued employment. When asked at her deposition if the salon employed "nonconformists" other than herself, Dawson replied: "It's like, you know, I don't think hairdressers are conformists anyway, so I would say the whole lot of them." Further, Dawson testified that she was not at all reticent about her lesbianism while working at the salon, but rather "discussed my life like anybody else would discuss their life and you know and I wasn't hidden about who I was." Dawson also stated that she was a willing participant in the sexually-charged banter that took place among the salon's employees, and that she would sometimes refer to herself as a "dyke." More generally, she stated that "lesbian jokes were brought up" and "you know, I like myself, I'm happy, so if this is light and funny, I'm with that."

The issue on which the parties disagree sharply is the quality of Dawson's performance as a hair assistant and as a participant in Bumble & Bumble's training program. Dawson alleges in her complaint that "her work was consistently praised by Connie Voines ... by other stylists, and clients" and that "several individuals who evaluated her work progress in the training program gave [her] positive feedback."

Dawson was terminated on July 15, 2000. According to Bumble & Bumble, Dawson's firing was the result of poor performance on the job and in the training program:

> Dawson's performance at the Salon was erratic: sometimes she performed well and with an enthusiastic attitude; other times, she did not. Over time, her performance on the Salon floor and in the educational program declined until it was unacceptable. For example, Dawson's performance in the basic cutting

class was inadequate to advance to basic razor.

\* \* \* \* \* \*

Dawson also demonstrated significant performance deficiencies on the Salon floor. Several clients complained that she had been rude or abrupt with them or rough with their hair—more than with any other assistant. Similarly, several stylists complained that she was hostile or disrespectful.

... By mid–2000, the level of dissatisfaction with Dawson's work had become extreme. In June 2000, Ralph Formisano, a senior stylist, registered serious complaints to Voines about Dawson's performance as his assistant. Formisano complained that he frequently could not find Dawson when he needed assistance with his clients, ... and that she was disrespectful and rude to him and his clients.

Voines spoke to Dawson and gave her a last chance. She assigned Dawson to assist stylists Nancy Morandi and Sharon Morrissey. Soon thereafter, Morandi registered complaints similar to Formisano's. Indeed, Dawson was so unhelpful that Morandi informed Voines that she did not want to work with Dawson any longer, even if that meant working with no assistant at all.

Appellee's Br. at 4–6 (internal citations omitted).

Dawson contends, however, that her failure to advance in Bumble & Bumble's training program and her termination are the result of discriminatory animus. As to the training program, Dawson alleges that it was repeatedly made clear to her that females rarely attained the position of hair stylist. Specifically, Dawson asserts that on one occasion when she asked Voines to place her in an editorial styling class, Voines stated, "How many women do you see doing editorial.... They only want

men with accents." Dawson also points to an affidavit from Amy Strober, another hair assistant, in which Strober states that when she asked to be assigned to a styling class, Voines said, "Do you know how many famous female editorial stylists there are? There is one."

With respect to her work on the salon floor as a hair assistant, Dawson alleges that she was subjected to a hostile work environment in that "[s]he was constantly harassed about her appearance, that she did not conform to the image of women, and that she should act in a manner less like a man and more like a woman." Dawson alleges that a range of invective was directed at her by fellow Bumble & Bumble employees: (1) two stylists, Howard McLaren and Raymond McLaren, repeatedly referred to her "in front of colleagues and clients, by the name 'Donald'"; (2) a stylist named Ralph Formisano once stated that she was "'wearing her sexuality like a costume,' implying that she did not conform to gender norms and appeared to be a lesbian"; and (3) a fellow hair assistant named Deniz Uzunoglu once "loudly proclaimed to [her], in extremely vulgar and threatening terms, that he thought she 'needed to have sex with a man.'"

In addition, Dawson asserts that the McLarens stated to educators in Bumble's education department that they wanted to fire her because of her "'dyke' attitude." Finally, Dawson alleges that her termination took place as follows:

On or about July 15, 2000, Voines informed Dawson that she was terminated because she "seemed unhappy" and because of the way she dressed and wore her hair. When Dawson asked for clarification, Voines stated that she could not send her to New Jersey or any place outside New York City. She added,

"People won't understand you ... you'll frighten them."

The United States District Court for the Southern District of New York (Marrero, J.) Granted Bumble & Bumble's motion for summary judgment with respect to all of Dawson's Title VII, NYSHRL, and NYCHRL claims. It held that: (1) Dawson could not assert a claim for discrimination based on sexual orientation because such claims are not cognizable under Title VII, *Dawson*, 246 F.Supp.2d at 314, and although they are cognizable under NYSHRL and NYCHRL, the evidence was insufficient to establish that Dawson suffered intentional discrimination based on her sexual orientation, *id.* at 313 n. 4; (2) even assuming that sex stereotyping may give rise to a sex discrimination action, Dawson's claims of sex stereotyping derive not from gender stereotypes, but rather from stereotypes based on sexual orientation, and thus are not cognizable under Title VII, *id.* at 315–18; (3) no reasonable jury could conclude that Bumble's denial of advancement opportunities to Dawson or her termination were motivated by intentional discrimination based on her gender, and Bumble's proffered reasons for its decision were not pretextual, *id.* at 323–24; and (4) the incidents of sexual harassment that Dawson alleged were not sufficiently severe or pervasive as to constitute a hostile or abusive work environment under Title VII, *id.* at 325. On appeal, Dawson challenges each of these grounds for granting summary judgment.

## DISCUSSION

"We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party." *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir.2003). The analysis according to which we consider whether Dawson has raised a triable issue of fact with respect to her claims under Title VII is well-established:

In order to survive a motion for summary judgment, a Title VII plaintiff must satisfy a three-part burden-shifting test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Ordinarily, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir.2001). If the plaintiff succeeds, a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action. *Id.* If the defendant proffers such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000). The plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

*Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 767 (2d Cir.2002). This analysis is also applicable to Dawson's claims under the NYSHRL and the NYCHRL. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000). We first consider whether Dawson has brought any claim cognizable under Title VII that raises a triable issue of material fact

### A. *Title VII Termination Claim.*

As already noted, Dawson defines herself in her complaint as "a lesbian female, who does not conform to gender norms in that she does not meet stereotyped expectations of femininity and may be perceived as more masculine than a stereotypical woman." In her brief on this appeal, Dawson further explains that she "is in three distinct, but somewhat interrelated protected classes ... because (1) she is a woman [,] ... (2) she does not conform to gender norms in that she appears more like a man than a woman, ... [and] she is (3) gay." The district court, however, observed that "because the borders [between these classes] are so imprecise, it is not eviden[t] exactly what conduct by Bumble Dawson claims as the gravamen of the claims she asserts on sex or gender grounds, as opposed to what actions she bases on sexual orientation or sexual stereotyping." *Dawson,* 246 F.Supp.2d at 311. The district court further opined that

> Dawson's claims of sexual discrimination, as she articulates them in the Complaint and elaborates in her deposition, [possess a] somewhat protean quality, [such that it is] hard to grasp or pinpoint precisely what conduct she accuses of offending whatever behavioral norms she asserts govern the circumstances. At various times in her pleadings and testimony, she asserts that she was disparately treated because of the way she looked, because she was a woman, because she was not a man, because she

was a lesbian, because she was a lesbian who did not conform to gender norms. *Id.*

We find ourselves in full agreement with these assertions. Both in her complaint and in her briefing on this appeal, Dawson has significantly conflated her claims. As a result, it is often difficult to discern when Dawson is alleging that the various adverse employment actions allegedly visited upon her by Bumble & Bumble were motivated by animus toward her gender, her appearance, her sexual orientation, or some combination of these. The following excerpt from her deposition testimony, in which Dawson states the reasons why she believed she had been terminated, is indicative of the problem:

> A. Because of the way I look.... [M]y visual presence was not acceptable. And the constant remarks about me being a lesbian ... made it clear that they were none too happy with that.
>
> Q. .... [I]s it fair to say that one of the things you're saying ... is that you believe you were discriminated against because of your sexual orientation?
>
> A. Yes.
>
> Q .... Is it fair to state that another thing that you're complaining about in this action is that you were discriminated against because you're a lesbian who looks a certain way?
>
> A. Yes.

■ Such confusion as to the sources of the discriminatory animus allegedly visited upon Dawson complicates her claims under Title VII because "[t]he law is well-settled in this circuit and in all others to have reached the question that .... Title VII does not prohibit harassment or discrimination because of sexual orientation." *Simonton v. Runyon,* 232 F.3d 33, 35 (2d Cir.2000). Thus, to the extent that she is alleging discrimination based upon her les-

bianism, Dawson cannot satisfy the first element of a prima facie case under Title VII because the statute does not recognize homosexuals as a protected class.

Realizing that discrimination based upon sexual orientation is not actionable under Title VII, Dawson avails herself of the "gender stereotyping" theory of Title VII liability according to which individuals who fail or refuse to comply with socially accepted gender roles are members of a protected class. As will be considered in more detail below, this theory rests upon the premise that in enacting Title VII "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (internal quotation marks omitted). As a result, "[s]ex stereotyping [by an employer] based on a person's gender non-conforming behavior is impermissible discrimination." *Smith v. City of Salem, Ohio,* 378 F.3d 566, 575 (6th Cir.2004). That is, individual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII.

When utilized by an avowedly homosexual plaintiff, however, gender stereotyping claims can easily present problems for an adjudicator. This is for the simple reason that "[s]tereotypical notions about how men and women should behave will often necessarily blur into ideas about heterosexuality and homosexuality." *Howell v. North Cent. Coll.,* 320 F.Supp.2d 717, 723 (N.D.Ill.2004). Like other courts, we have therefore recognized that a gender stereotyping claim should not be used to "bootstrap protection for sexual orientation into Title VII." *Simonton,* 232 F.3d at 38. *See also* Lex K. Larson, 10 *Employ-ment Discrimination* § 168.10[1] (2d ed. 2003) ("It is not uncommon for plaintiffs to fall short in their Title VII pursuits because courts find their arguments to be sexual orientation (or other unprotected) allegations masquerading as gender stereotyping claims."); Kristin M. Bovalino, *How the Effeminate Male Can Maximize His Odds of Winning Title VII Litigation,* 53 Syracuse L.Rev. 1117, 1134 (2003) (counseling "gay plaintiffs bringing claims under Title VII[to] emphasize the gender stereotyping theory and de-emphasize any connection the discrimination has to homosexuality").

The point is well illustrated in *Simonton.* That case involved a male postal worker whose homosexuality was known to his fellow employees. Simonton's complaint alleged that he was "subjected to an abusive and hostile work environment by reason of his sexual orientation. The abuse he allegedly endured was so severe that he ultimately suffered a heart attack." 232 F.3d at 34. After holding that Title VII did not outlaw discriminatory treatment based upon animus toward homosexuals, *id.* at 35, we next considered the plaintiff's assertion of a gender stereotyping claim. We declined to reach the merits of this claim, however, because

> Simonton has failed to plead sufficient facts for our consideration of the issue. We do not have sufficient allegations before us to decide Simonton's claims based on stereotyping because we have no basis in the record to surmise that Simonton behaved in a stereotypically feminine manner and that the harassment he endured was, in fact, based on his non-conformity with gender norms instead of his sexual orientation.... In the circumstances, we think the wisest course is to defer consideration of the merits of such an argument to another case in which it comes to us after being

properly pled and presented to the district court.

*Id.* at 38 (internal citations omitted); *see also Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir.2001) (gay male plaintiff had no claim under Title VII because "he did not claim that he was harassed because he failed to comply with societal stereotypes of how men ought to appear or behave"); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) (finding that gay male automobile worker was subjected to harassment by fellow employees because of sexual orientation, not because "co-workers perceived him to be too feminine to fit the male image at Ford"); *cf. Smith*, 378 F.3d at 574 (finding that district court erred when it "gave insufficient consideration to Smith's well-pleaded claims concerning his contra-gender behavior, but rather accounted for that behavior only insofar as it confirmed for the court Smith's status as a transsexual").

Similarly, district courts in this Circuit have repeatedly rejected attempts by homosexual plaintiffs to assert employment discrimination claims based upon allegations involving sexual orientation by crafting the claim as arising from discrimination based upon gender stereotypes. *See Martin v. New York State Dep't of Corr. Servs.*, 224 F.Supp.2d 434, 447 (N.D.N.Y. 2002) ("The torment endured by Martin . . . [t]he name-calling, the lewd conduct and the posting of profane pictures and graffiti are all of a sexual, not gender, nature."); *Samborski v. West Valley Nuclear Servs., Co.*, 2002 WL 1477610, at *3 n. 11 (W.D.N.Y. June 25, 2002) (stating in dicta that although "being called a 'lesbian' [may be] based not on a perception of true sexual orientation, but rather as a means of denigrating a person because of sexual stereotype," plaintiff's gender stereotyping claim is "somewhat undermined" to the extent that it rests upon being called a

lesbian); *Trigg v. New York City Transit Auth.*, 2001 WL 868336, at *6 (E.D.N.Y. July 26, 2001) (rejecting gender stereotyping claim because plaintiff's "Amended Complaint is rife with references to sexual orientation, homophobia, and accusations of discrimination based on homosexuality"), *aff'd without opinion*, 50 Fed.Appx. 458 (2d Cir.2002); *cf. Kay v. Independence Blue Cross*, 2003 WL 21197289, at *5 (E.D.Pa. May 16, 2003) (holding that gay male plaintiff "has shown that he was subjected to adverse treatment because of his co-workers['] perceptions that he was a 'miss prissy' or less than [a] 'real man.' As such, there is affirmative evidence that the harassment was related to perceptions about Mr. Kay's masculinity, rendering the conduct gender stereotyping actionable under Title VII."); *Heller v. Columbia Edgewater Country Club*, 195 F.Supp.2d 1212, 1224 (D.Or.2002) (lesbian plaintiff stated Title VII claim by alleging discrimination based upon her failure to conform to supervisor's "stereotype of how a woman ought to behave. Heller is attracted to and dates other women, whereas Cagle believes that a woman should be attracted to and date only men.").

With these cases in mind, we proceed to consider our recent decision in *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107 (2d Cir.2004). In that case, we reviewed a district court's grant of summary judgment to a public school district that contended that it had denied tenure to a school psychologist because of her poor job performance. The psychologist asserted, however, "that the real reason she was let go was that the defendants presumed that she, as a young mother, would not continue to demonstrate the necessary devotion to her job, and indeed that she could not maintain such devotion while at the same time being a good mother." *Id.* at 113. We thus noted that the case presented the question of

"whether stereotyping about the qualities of mothers is a form of gender discrimination." *Id.*[1]

We reversed the district court's grant of summary judgment to the school district and found instead that the school psychologist had raised a sufficient issue of issue of fact as to whether her tenure denial was the result of her superiors' belief that a woman could not be both a good mother to young children and a dedicated school psychologist. We noted allegations of a range of comments indicative of this belief, including allegations that her superiors

> wondered "whether my apparent commitment to my job was an act. They stated that once I obtained tenure, I would not show the same level of commitment I had shown because I had little ones at home. They expressed concerns about my child care arrangements, though these had never caused me conflict with school assignments."

\* \* \* \* \* \*

Back claims that in March, Brennan and Wishnie reiterated that her job was "not for a mother," that they were worried her performance was "just an 'act' until I got tenure," and that "because I was a young mother, I would not continue my commitment to the work place." On April 30, 2001, Brennan and Wishnie purportedly repeated the same concerns about her ability to balance work and family, and told Back that they would recommend that she not be granted tenure .... They reportedly also "stated they wanted another year to assess the child care situation."

*Id.* at 115.

In considering whether comments such as these were sufficient to make out a Title VII claim, we relied upon the Supreme Court's path-breaking decision in *Price Waterhouse.* In that case, a female accountant who had been denied promotion to partnership drew attention to the fact that employment evaluations completed by her superiors were rife with criticisms of her tendency to act in what was seen as a masculine manner. Thus, it was suggested that she "overcompensated for being a woman" by acting in a "macho" fashion, and that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235, 109 S.Ct. 1775. The Court held that this might amount to impermissible discrimination because "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender," in a manner that might violate Title VII. *Id.* at 250, 109 S.Ct. 1775. The Court explained that

> we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.

U.S.C. § 1983. *Id.* at 122–23. We noted, however, that a Section 1983 claim arising from an employment discrimination dispute was subject to the same method of evaluation as a Title VII claim. *Id.* at 123.

---

**1.** As an employee of a public school district, the plaintiff in *Back* did not bring a claim under Title VII, but rather asserted that she had been denied her constitutional right to equal protection of the laws in violation of 42

*Id.* at 251, 109 S.Ct. 1775 (citations and internal quotation marks omitted).

In *Back*, we similarly concluded that the school psychologist had sufficiently alleged that she had also been placed in a Catch 22 situation because her superiors' adherence to a stereotypical perception as to how a mother of young children should behave precluded their grant of tenure to a school psychologist who also happened to be a mother of young children. That is, we held "that stereotypical remarks about the incompatibility of motherhood and employment 'can certainly be evidence that gender played a part' in an employment decision." 365 F.3d at 122 (quoting *Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. 1775; emphasis omitted).

In contrast to the plaintiffs in *Back* and *Price Waterhouse*, Dawson has not alleged that she was similarly subjected by Bumble & Bumble to gender stereotyping. Generally speaking, one can fail to conform to gender stereotypes in two ways: (1) through behavior or (2) through appearance. Dawson makes no assertion with respect to behavioral non-conformance. That is, unlike the plaintiff in *Price Waterhouse*, she was not told by anyone at Bumble & Bumble that her continued employment depended upon her acting and speaking in a more "feminine" manner. There is also no allegation that Dawson's work assignments were restricted in any way to those considered "appropriate" for a woman to perform. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 290 (2d Cir.1998) (female

secretary's claim of gender stereotyping must fail where all work she was asked to perform was "quintessential secretarial work").

Dawson's claim with respect to gender stereotyping thus rests upon the contention that her appearance was unacceptable in the eyes of Bumble & Bumble. Dawson states her position in this regard most comprehensively in an affidavit filed after she was deposed:[2]

> My outward appearance does not conform to the traditional expectations of the way a woman would look. I do not conform to our society's gender norms because of the way I present myself, including my manner of dress, hair style, my lack of feminine jewelry, lack of feminine perfume, and lack of make-up. I also do not have a noticeable chest or wide hips, and my body type is more like a male than a female. In sum, my overall appearance is more like a male than a female. In fact, many people think that I look less like a female and more like a male.

Whatever the accuracy of this statement, the record in this case is simply devoid of any substantial evidence that Dawson was subjected to any adverse employment consequences as a result of her appearance. With respect to her "manner of dress," there is no evidence that the Bumble & Bumble salon even employed a formal dress code for its employees, let alone a dress code that reinforced gender stereotypes.[3] On the contrary, Dawson

---

**2.** Although we consider this averment, we agree with the finding of the district court that the filing of this affidavit was an act of dubious propriety in that many of the statements set forth therein are clearly attempts "to supplement or amend her deposition, so as to contradict or put a different gloss on particular testimony she gave under oath in

the presence of her counsel." *Dawson,* 246 F.Supp.2d at 307 n. 1.

**3.** We have recently expressed some reluctance to evaluate employee dress codes in light of purported stereotypes as to proper feminine and masculine dress. In *Zalewska v. County of Sullivan,* 316 F.3d 314, 323 (2d Cir.2003), we rejected a challenge to an em-

has not contradicted the assertion of Connie Voines, the salon manager, to the effect that Dawson "generally wore leather pants and a jean jacket when working, none of which was objectionable from the Salon's point of view."

The only evidence presented by Dawson which tends to show that her style of dress was not acceptable comes in the form of alleged statements by co-workers. First, in her complaint Dawson alleges that she was "harassed by Ralph [Formisano], a stylist. He accused Dawson of 'wearing her sexuality like a costume,' implying that she did not conform to gender norms and appeared to be a lesbian." Only in her post-deposition affidavit does Dawson clearly state that this comment had anything to do with her "overall appearance" and was not simply concerned with her sexual orientation. Dawson's complaint also contains the allegation that "Howard and Raymond McLaren repeatedly referred to Dawson, in front of colleagues and clients, by the name 'Donald.' " Realizing that these comments also provide ambiguous support for a gender stereotyping claim, Dawson asserts in her brief on this appeal that she "believed the comments were related to her masculine appearance and/or her sexual orientation."

Bumble & Bumble *does* have a policy regarding hairstyles: employees must have their hair cut by Bumble & Bumble stylists as a means of advertising the salon's techniques. Dawson does not argue that this rule is discriminatory in itself, and any claim that it improperly enforces employees to conform to gender stereotypes is decisively belied by Connie Voines' uncontested assertion that for part of the time during which she was employed at the salon, Dawson was allowed to wear her hair "in a 'mohawk' style (in her case, extremely short in the back and on the sides, with a strip of longer hair down the center of her head)." Because this haircut was performed by a Bumble & Bumble stylist, the salon had no objection to it. Indeed, Voines states without contradiction that "many women [besides Dawson] who have worked at the Salon have had very short hair" and that one female employee had *all* of the hair on her head shaved down to only fuzz."

It is further uncontested that shortly before her termination Dawson—as Voines states it—"got an extremely unprofessional-looking haircut at a barbershop." Bumble & Bumble contends that, as a result, "Voines chastised Dawson for her flagrant violation of the Salon's haircut rule and for the resulting disastrous haircut." Dawson herself testified that when Voines told her she was fired, the haircut was mentioned and, specifically, that it would prevent Dawson from doing "product outreach work" for Bumble. Striving to use this incident to bolster her gender stereotyping claim, Dawson argues that it could not be a legitimate basis for firing her because "she had her hair re-cut by a Bumble stylist" after being chastised by Voines. But this response obviously overlooks the fact that violating the rule is a form of insubordination.

In sum, in contrast to the plaintiff in *Price Waterhouse*, who proffered evidence that her promotion to partnership depended upon her changing her behavior to better conform to gender stereotypes, or the plaintiff in *Back*, who demonstrated a triable issue of fact as to whether her superiors felt that her continued employment violated gender stereotypes, Dawson has produced no substantial evidence from

ployer's policy forbidding van drivers from wearing skirts because "[a]sking us to accept the proposition that a woman wearing pants dresses more masculinely requires a perpetuation of the very stereotypes that courts are supposed to suppress."

which we may plausibly infer that her alleged failure to conform her appearance to feminine stereotypes resulted in her suffering any adverse employment action at the hands of Bumble & Bumble. Thus, her Title VII claim based upon a gender stereotyping theory must fail. *See Weinstock,* 224 F.3d at 44 (allegation that superior referred to candidate for professorial tenure as "nice" and "nurturing" insufficient to support gender stereotyping claim); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 573 (2d Cir.2000) (claim of race discrimination based upon store's alleged policy of "preferring employees with the 'Coach look,' i.e., white and blond," even assuming *arguendo* that such policy existed, must be dismissed where plaintiff "failed to demonstrate that this preference affected her employment in any way").

### B. *Title VII Hostile Work Environment Claim.*

■ We see no reason to disturb the district court's careful consideration of Dawson's claim that she was subjected to a hostile work environment because of offensive comments made by her co-workers. This claim rests upon the comments made by Formisano and the McLarens already considered above, and by the comment made by Dawson's fellow hair assistant Deniz Uzunoglu, who once "loudly proclaimed to [her], in extremely vulgar and threatening terms, that he thought she 'needed to have sex with a man.'"

The district court understandably expressed some confusion as to whether these comments were actionable under Title VII because they appeared to relate to Dawson's sexual orientation and not merely to her gender. *See Dawson,* 246 F.Supp.2d at 326–27. In any event, assuming *arguendo* that the comments were potentially actionable under Title VII, the district court correctly found

that no issue of triable fact existed as to whether the incidents "were so severe or pervasive to create a hostile or abusive work environment" within the meaning of Title VII. *Id.* at 327. We also note that the district court correctly asserted that Uzunoglu's comments were "crude and offensive," but that any liability against Bumble & Bumble arising from the comments was precluded by the salon's disciplining of Uzunoglu after Dawson complained of his actions. *Dawson,* 246 F.Supp.2d at 329.

### C. *Title VII Failure to Promote Claim.*

■ As with her hostile work environment claim, Dawson's professions regarding her claim that Bumble & Bumble failed to promote her because of discriminatory animus are also confusing. Dawson alleges in her complaint that she "was denied promotional opportunities [offered through the training program] because she was a lesbian who did not conform to gender norms." We have already noted, however, that Dawson also alleges that Connie Voines explained Bumble & Bumble's failure to promote Dawson as being based upon a belief that only men could succeed in the styling profession. *See supra,* p. 215. Since Voines's alleged comments refer to a preference for males, and make no mention of gender stereotypes or sexual orientation, we are puzzled by the allegation in Dawson's complaint to the effect that Bumble & Bumble gave promotional preference to "heterosexual men and women who conformed to gender norms." Dawson has produced no credible evidence that gender stereotypes played any part in Bumble & Bumble's decisions as to promotions to hair stylist.

Further, assuming *arguendo* that Dawson has made out a prima facie case of gender discrimination on the basis of

Voines's alleged comments, Bumble & Bumble has successfully met its burden to refute any inference of discrimination arising from them. As noted by the district court, Bumble & Bumble presented statistical evidence that "nine out of fifteen assistants ... selected for the advanced styling class while Dawson worked at the Salon were women" and that "of the 38 assistants hired by the Salon during the 17 months Dawson was employed, only four of them, all of them women, advanced through the entire educational program and were promoted to stylist." *Dawson,* 246 F.Supp.2d at 323. We do not see that Dawson has made any effort to refute these statistics beyond the bald assertion in her complaint that she "was confident that she would be able to graduate from the hair assistant training program to a stylist in an expedited fashion." This merely subjective assessment of her chances for promotion does not create an issue of fact as to whether Bumble & Bumble's failure to promote Dawson was motivated by discriminatory intent. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129–30 (2d Cir.1996).

### D. *NYSHRL and NYCHRL Sexual Orientation Discrimination Claims.*

■ While claims of sexual orientation discrimination are actionable under the NYSHRL and NYCHRL, we have already noted that the question of whether such claims can survive summary judgment is determined by the same analysis as for Title VII claims. *See supra,* p. 217. The only evidence proffered by Dawson which supports a claim of discrimination based upon sexual orientation which we have not considered above concerns Dawson's claim that shortly before her termination Howard and Raymond McLaren told Monica Cunningham and Coco Santiago, educators at Bumble's education department, that they wanted to fire Dawson because of her "'dyke' attitude." [4] Dawson further alleges, also upon information and belief, that "Howard and Raymond McLaren have decision making authority to hire and terminate employees."

The parties dispute whether the McLarens made the alleged comments; Cunningham avers that they were made, while Raymond McLaren and Coco Santiago deny it. But assuming *arguendo* that the statements were made, we find that the district court correctly determined that "Dawson has produced no admissible evidence ... that the McLarens played any role in Dawson's discharge." *Dawson,* 246 F.Supp.2d at 325. Dawson stated at her deposition that she did not know who made the decision to fire her. For her part, Cunningham states in her affidavit that she "know[s] that Howard and Raymond McLaren are usually very much involved in the evaluation of assistants and in making decisions whether to promote or fire assistants." At her deposition, however, Cunningham testified that she did not know who made the decision to fire Dawson and could not recall a single specific instance in which the McLarens were involved in a decision to terminate a Bumble & Bumble hair assistant. Dawson has therefore not demonstrated that a material issue of fact exists with respect to the truth of Connie Voines' several assertions that she made the decision to terminate Dawson with no input from the McLarens.

---

4. As already noted, Dawson also alleges that when she was terminated, Connie Voines "stated that she could not send [Dawson] to New Jersey or any place outside New York City [to do product promotion for Bumble & Bumble]. She added, 'People won't understand you ... you'll frighten them.'' This alleged comment is plainly too ambiguous to support a claim for sexual orientation discrimination.

We thus conclude that Dawson cannot base a claim of sexual orientation discrimination on the McLarens' alleged comments. *See, e.g., McLee v. Chrysler Corp.,* 109 F.3d 130, 137 (2d Cir.1997) (finding that allegations of bias against a supervisor who was not consulted about a termination decision "provide no basis for imputing to [the decisionmaker] an invidious motivation for the discharge").

## CONCLUSION

The judgment of the district court is AFFIRMED.