EDITH H. JONES, Circuit Judge,
dissenting, joined by JOLLY, SMITH, DeMOSS, CLEMENT, and OWEN, Circuit Judges.
Bad facts often inspire bad law. And sex talk doesn’t always mean that sex is involved. Supervisor Wolfe’s conduct was, indeed, bad, boorish and juvenile. What elevated grossness in an all-male environment to a Title VII claim of employment discrimination “because of’ Woods’s “sex”? The EEOC had to offer an expert witness to explain its case. That should tell us something. In Title VII opposite-sex cases, we need no expert to explain the employment implications of sexual come-ons, put-downs, pat-downs, and stereotyping.[1] Here, an all-male, heterosexual crew was performing a “macho” job. We know that men behave differently when women aren’t around (as do women surrounded by women). No physical touching, threats, sexual quid pro quo, or employment retaliation was imposed on the plaintiff. Yet without such hard proof of sexually-motivated harassment, the majority affirms a substantial sexual harassment verdict for Kerry Woods. As Judge Jolly’s dissent notes, based on this decision, every one of Woods’s co-workers could have filed suit against Boh Brothers.
This decision, however, goes farther than its application to single-sex workplaces. EEOC claimed to advocate that there is “no coarse workplace exclusion” from Title VII, especially for classically male locales like the oil patch. What it has persuaded the majority to adopt is the disturbing proposition that, to avoid exposure to Title VII liability, employers must purge every workplace of speech and gestures that might be viewed in any way as tokens of sex discrimination.[2] Consider the attached memorandum, “Etiquette for Ironworkers,” which suggests how prudent employers may respond to the majority decision. Today’s holding shifts Title VII toward liability based on offending speech alone, without tether, as Judge Jolly notes, to discrimination “because of’ sex. Vulgar speech is ubiquitous in today’s culture and is everywhere else protected from government diktat by the First Amendment. In the workplace, however, vulgar or offensive speech may now inspire litigation that costs employers hundreds of thousands of dollars to defend; may forever stigmatize the “harasser” whose principal crime was *476 bad taste; may be outlawed by workplace sensitivity training; and may subject workplaces to intrusive, court-ordered in-junctive monitoring. In essence, this judgment portends a government-compelled workplace speech code.[3] I therefore dissent.
Judge Jolly’s excellent dissent makes clear that the majority succumbed to this theory in a dubious case. I concur in his dissent and in Judge DeMoss’s observation that on remand, the district court need not recalculate the damages verdict to render the elimination of punitive damages a pyrrhic victory.
This dissent will address additional reasons why Wolfe’s misconduct was not actionable “gender stereotyping” sexual harassment; the erroneous introduction of expert testimony to support EEOC’s case; and the employer’s Ellerth/Faragher defense.
1. No Actionable Sex Harassment.
Judgment as a matter of law should have been granted, because there is insufficient evidence that Wolfe harassed Woods “because of’ Woods’s sex.
The verdict for Woods cannot be justified simply by adding Price Waterhouse’s plurality theory of “gender stereotyping” on top of Oncale. Pnce Waterhouse has become the talisman for claims of gender stereotyping.[4] I do not dispute that other circuits have recognized this as a specific form of sexual harassment discrimination under Title VII. It is important to recall, though, that Price Waterhouse dealt with a concrete adverse employment action, the denial of partnership in an accounting firm, and the partners evaluated the plaintiff based on well-known indicia of the stereotyping of female appearance and behavior.[5] Their overt stereotyping was evidence of a motivation to discriminate against the plaintiff because she was a non-stereotypical female. Here, unlike in Price Waterhouse, there is no overt stereotyping — unless epithets like “princess,” “fairy,” and “queer” used among avowedly heterosexual men may be inferred to connote gender stereotyping.
Oncale, moreover, does not require affir-mance of this verdict. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In fact, the Supreme Court went out of its way—unanimously and repeatedly — stressing *477 that Title VII cannot impose a “code of civility” on the American workplace; that “common sense, and an appropriate sensitivity to context” must prevail in courts and juries to determine what constitutes same gender harassment. This is not to contend that the three examples of same-sex harassment offered by the Court were exclusive. But proof of same-sex harassment on any other grounds has to take account of the overall social context of the behavior, including “relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.” 523 U.S. at 82, 118 S.Ct. at 1003. Hence, the Court emphasized, behavior in the locker room is not the same as when men engage in similar behavior with women. Finally, an employee “must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted ‘discrimination] ... because of ... sex.’ ” Oncale, 523 U.S. at 81, 118 S.Ct. at 1002 (quoting Title VII) (emphasis in original).
Context, and the nature of the misconduct, are everything in a same-sex environment. Case law holds that sex talk does not necessarily connote actionable harassment “because of sex” even in opposite-sex harassment cases. See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (“simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment’ ”); see also, Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir.1999) (finding that “each comment made by [harasser was] the equivalent of a mere utterance of an epithet that engender offensive feelings,” but did not suffice to survive summary judgment) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citations and quotations omitted)). Hence, in a same-sex case like this one, it makes no sense at all to affirm a verdict that a heterosexual male “discriminated against” another heterosexual male by calling him names, which both know not to be true by conduct or appearance. Name-calling may be bullying, but it isn’t discrimination because the victim is a male. Contrary to common sense, the majority opinion says that “[w]e do not require a plaintiff to prop up his employer’s subjective discriminatory animus by proving that it was rooted in some objective truth [about the plaintiff].” Perhaps dispensing with “objective truth” would be acceptable in opposite-sex discrimination cases: everyone knows what such stereotyping is and how it functions to demean a victim and place the victim at a disadvantage in the workplace.[6] In an all-male workplace, however, we move into Oncale territory, where, I would contend, crude sexual epithets are ubiquitous to the point of triviality. They cannot alone support an inference of the harasser’s motivation to discriminate “because of’ sex. Recognizing this contextual ambiguity, all of the gender stereotyping same-sex harassment cases to date have regarded the non-gender-conforming behavior or appearance of the plaintiff (or the harasser) as crucial to raising an inference of illegal discrimination. This “objective proof’ was necessary to support an inference of discrimination “because of’ sex. Not to require such proof in these same-sex cases is to foster an entirely protean, standardless cause of action.
*478 Woods did not testify he was singled out because he appeared or acted unmanly. This workplace was rife with all the workers’ sex-charged epithets, and Wolfe exhibited gross and obscene conduct toward several of them (including Wolfe’s “mooning” many other people near the worksite). Woods contends only that he was singled out for humiliation.[7] The epithets and obscene gestures and the plaintiffs use of “Wet Ones” handwipes are the majority’s only support for Wolfe’s subjective discriminatory mindset.[8] The epithets, though obnoxious, are not ordinarily regarded as “because of’ sex; “princess,” “fairy,” even “faggot,” are simply epithets, like “bitch,” or “son of a bitch.” By the way, Wolfe also repeatedly referred to Woods as an “MF,” which is hardly homophobic, and he made fun of Woods’s sexual relations with his wife. Cf. Galloway v. Gen. Motors Serv. Parts Operations, 78 F.3d 1164 (7th Cir.1996)(calling a woman “sick bitch” repeatedly and along with obscene gestures was not, in context, sexual harassment). Allowing words and gestures alone to support an inference of same-sex gender stereotyping harassment is a truly novel holding.
All other courts to date have recognized that because of the different context inherent in workplace interactions between members of the same sex, sexual epithets alone are insufficient to raise a legitimate inference of gender-stereotyping harassment discrimination. Confronted with a Title VII case involving the use of even more extreme sexual epithets between two heterosexual men, the Seventh Circuit affirmed a grant of summary judgment. Johnson v. Hondo, Inc., 125 F.3d 408, 412-13 (7th Cir.1997). The court explained that expressions such as ‘f* * * me,’ ‘kiss my a* *,’ and ‘s* *k my d* *k,’ which were repeatedly used against the plaintiff, “are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference.” Id. at 412. The court concluded,
In this case, the plaintiffs sole evidence bearing on the gender-based nature of Hicks’ provocations is the facially sexual content of Hicks’ remarks. Upon scrutiny, however, no reasonable factfinder could conclude that Hicks directed his vulgar comments at Johnson because of his gender. It appears plain on the record as a whole that Hicks’ remarks to Johnson were nothing other than vulgar provocations having no causal relationship to Johnson’s gender as a male.
Id. at 413. See also Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 468 (6th Cir.2012) (holding that male plaintiffs hostile work environment claim failed because there was no credible evidence that he was not heterosexual); EEOC v. McPherson Cos., Inc., 914 F.Supp.2d 1234, 1243-45 (N.D.Ala.2012) (holding that male plaintiff failed to assert a sexual harassment claim when there was no evidence that he failed to conform to male stereotypes).
The only objective way for courts or juries to grasp that a same-sex harasser is acting “because of’ the victim’s sex is for the victim (or the harasser) visibly not to *479 conform to gender stereotype. An insightful opinion from the Second Circuit, summarizing the case law, concluded that non-gender-conforming behavior or appearance are preconditions to a gender stereotyping Title VII claim. Dawson v. Bumble & Bumble, 398 F.3d 211, 221 (2d Cir.2005) (Pooler, J.); see also Lewis v. Heartland Inns of Am., LLC, 591 F.3d 1033, 1036 (8th Cir.2010) (Murphy, J.)(evidence supported inference of gender stereotyping where female plaintiff had been mistaken for a male, described herself as “slightly more masculine,” wore men’s button down shirts and slacks, avoided makeup, and had short hair). Even the plaintiff in Price Waterhouse evidently did not “conform” objectively to stereotypical female appearance and behavior. The majority opinion cites not a single case to the contrary.[9]
In an effort to prop up its holding, the majority likens this case to Farpella-Crosby v. Horizon Health Care, 97 F.3d 808 (5th Cir.1996), which affirmed a Title VII sexual harassment verdict, but more than sexual talk was going on. The male supervisor harassed a female employee with frequent questions and comments about her sexual activity. He joked about her sex life in front of others, and threatened her with firing when she objected to the mistreatment. The personal quality of the interrogations, the threat of job loss, and the more provocative context of a male boss and female employee discussing her sex activities distinguish Farpella-Crosby from this case.
Contrary to Oncale, and parting company with any requirement that ties alleged same-sex harassment to “objective truth,” the majority opinion threatens to transform the American workplace with a judicially-enforced “code of civility.” After all, any female working in an office dominated by females can follow Woods’s example and complain she was harassed “because of’ sex if the other ladies talk dirty to or around her. If bawdy epithets or misunderstood humor can be grounds for inferring same-sex gender stereotyping, then cautious employers must monitor and ban “offensive” speech and punish “offenders.” The judgment should be reversed.
2. Expert Witness Testimony.
The majority dispenses in a footnote with the question whether a psychiatrist’s testimony offered in support of EEOC’s theory of liability was an abuse of discretion. I would hold that it was erroneously admitted, that its admission was harmful, and that the court’s failure to grant a new trial was therefore an abuse of discretion. Oncale admonished juries and courts to use “common sense” in assessing same-sex harassment claims. We do not need expert psychiatrists to enlighten us about the meaning of juvenile and gross expressions and gestures.
*480 Dr. Gold qualified as an expert in reviewing and assessing scientific articles addressing sexual harassment. Whether the activities she described as occurring at all-male, isolated work sites constitute legally actionable sexual harassment was the principal issue before the jury. Although she did not opine on the testimony in this case, her opinions described research that tracked almost exactly the conduct and situation of the Boh Brothers work crew and Wolfe’s actions in particular. She classified the same epithets that Wolfe used and the same conduct he engaged in as sex-stereotyping activity. Dr. Gold specifically defined sex harassment in sociological, not legal terms, and she defined it “from a social science standpoint” as based on plaintiffs subjective views.[10]
This testimony was inadmissible for two reasons. First, it dealt with a subject as to which expert testimony adds nothing significant to the experience of a lay jury. Her expertise did not “help the trier of fact to understand the evidence or to determine a fact in issue ...” Fed.R.Evid. 702(a). Regarding this area of human relations and the intensely context-specific inquiry, judges and juries should be able to differentiate between bullying with sex words and bullying because the victim is a male. EEOC’s en banc brief asserts a need for expert testimony because “[mjany laypersons serving on juries will have had little experience with or knowledge about the type of sexual harassment that occurs in unique, male-dominated work settings like police departments or oil-rig crews.” Many laypersons serving on juries will not have been employed in any of the environments from which sex discrimination cases may spring, for example, sales forces, medical clinics, universities, or manufacturing plants. Each workplace has unique characteristics, but “common sense” informs juries whether objectionable behavior occurred “because of’ a victim’s sex.
Second, cloaked in the mantle of “expertise,” her testimony had to confuse the jury between the “sociological” perspective, which, as she said, is solely based on the plaintiffs subjective views, and the legal definition of harassment that requires objective evidence of the harasser’s motive and objectively severe misconduct. In this case, the potential confusion was heightened because Wolfe’s discriminatory motive was shown at most by Wolfe’s comment about Woods’s use of Wet Ones; the only other “evidence” of motive was obscene words and gestures Wolfe directed at Woods as well as other workers, inspectors, and his own son. Thus, not only was the psychiatrist’s testimony confusing on the standard of liability, but it was also the essential connector between Woods’s allegations and a finding of harassment “because of’ sex.
That expert testimony has occasionally been admitted in Title VII cases is not determinative of its admissibility in this novel and unprecedented case. Notably, in none of the sexual harassment cases cited by the majority or this dissent was expert testimony introduced to “explain” gender stereotyping harassment. Even more notably, although an expert witness testified in the seminal Price Waterhouse case, the plurality opinion says, “we are tempted to say that Dr. Fiske’s testimony was merely icing on Hopkins’ cake. It takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring “ ‘a course at charm school.” ’ ” 490 U.S. at 256, 109 S.Ct. at 1793. The employer, furthermore, did not challenge the admissibility of the expert’s testimony. See 490 *481 U.S. at 255, 109 S.Ct. at 1793. Justice O’Connor, concurring in the judgment, went out of her way to state her view that “testimony such as Dr. Fiske’s in this case, standing alone, would not justify shifting the burden of persuasion to the employer [to prove a non-discriminatory basis for an employment action.]” 490 U.S. at 277,109 S.Ct. at 1805. She went on to demonstrate the importance of context in these cases:
Race and gender always “play a role” in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion. For example, in the context of this ease, a mere reference to “a lady candidate” might show that gender “played a role” in the decision, but by no means could support a rational factfin-der’s inference that the decision was made “because of’ sex. What is required is what Ann Hopkins showed here: direct evidence that decisionmak-ers placed substantial negative reliance on an illegitimate criterion in reaching their decision.
Id. If Woods could not show “direct evidence” that “[Wolfe] placed substantial negative reliance on an illegitimate criterion,” i.e. Woods’s sex, without an expert, then Woods’s claim should fail. Only a new trial can test this proposition.
3. Ellerth/Faragher Defense:
Under this defense, an employer will not be vicariously liable for harassment by a supervisor if it can show: “(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Watts v. Kroger Co., 170 F.3d 505, 509-10 (5th Cir.1999) (quoting Faragher, 524 U.S. at 807, 118 S.Ct. at 2293) (internal quotation marks omitted).
Boh Brothers satisfied both aspects of the test as a matter of law. The majority opinion correctly notes that an employer can satisfy the first prong by promulgating an anti-harassment policy that includes adequate complaint procedures. Boh Brothers’ nondiscrimination policy stated: “All personnel actions including, but not limited to, compensation, benefits, transfers, layoffs ..., will be administered without regard to race, color, religion, disability, sex, or national origins” and “[a]ll working conditions will be maintained in a non-discriminatory manner.” Although the majority opinion criticizes it for being broad, the language parallels Title VII. The Boh Brothers policy was posted at job sites, was mailed to employees, and was provided to them when hired. The company instructed employees that they could report to their supervisor, to someone in authority above the supervisor, to a job foreman, or to John Lipani, the corporate in-house counsel and an EEOC officer.
The majority opinion takes Boh Brothers to task for many alleged inadequacies in the company policy, even while it concedes that “proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance.... ” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257. Here, the proofs in the pudding: Boh Brothers had not one “cause” finding by EEOC in forty years preceding this case. Surely the company should be credited for maintaining a successful policy in practice. Every case must turn on its own facts. In these circumstances, the majority’s lengthy discussion of the formalities they feel should accompany anti-discrimination policies is *482 gratuitous.[11]
Moreover, whether other employees had actually read the policy is irrelevant, because Woods knew how and to whom to complain about harassment. He complained to Wolfe himself when Wolfe, in very bad taste, slurred Woods’s daughter. (This is the single event that brought tears to Woods’s eyes.) Significantly, Wolfe apologized and never repeated the action. He complained once to Tim Carpenter about Wolfe’s urinating at the job-site. Finally, Woods knew to complain to Duckworth about Wolfe’s gross words and gestures. He never did so until, after working more than six months under Wolfe, his own misconduct was reported. There is no doubt that the company’s general anti-discrimination or anti-harassment policy was known to Woods. Because Woods unreasonably failed to take advantage of corrective opportunities provided by the employer, Boh Brothers satisfies the second Faragher prong. See, e.g., Hockman, 407 F.3d at 329.
Finally, the majority chastises Boh Brothers’ management for being insufficiently aware of the law concerning same-sex gender stereotyping in all-male, isolated jobsites. Ignorance of the law is asserted to be no defense. My response is simple: if the EEOC required a psychiatrist to explain this phenomenon, one should not fault the company for having failed to describe it in official employee notices. Further, as previously noted, no other circuit court has affirmed a verdict or denied an employer summary judgment based on the thin record in this case. Other courts have rejected claims on similar facts or required that either the victim or harasser exhibit non-gender-conforming appearance or behavior.
Based on the company policy and Woods’s plain understanding of his rights, this case would not have existed but for Woods’s tactical delay in complaining.
For all these reasons, I respectfully dissent.
ETIQUETTE FOR IRONWORKERS
MEMO TO: Management
FROM: Legal Department of Apex Co.
DATE: September 2013
In keeping up with the newest developments in employment law, we have carefully reviewed and hired specialist outside counsel to give us a legal opinion concerning the implications of a recent Fifth Circuit en banc decision. EEOC v. Boh Bros.... Like us, the employer in that case engaged in heavy construction and often operated in all-male crews. Like us, it had an unblemished record, years without a Title VII case. But the court ruled that common sexual epithets and vulgar gestures, when used too frequently by a male, heterosexual supervisor, can support a verdict against the company on behalf of another male, heterosexual plaintiff. Instead of looking on these actions as horseplay or, at worst, bullying, the court approved a jury verdict for “gender-stereotyping harassment.” The EEOC intends to make this ease an example for similar workplaces.
*483 We need not advise you of the costs a company can incur in these cases. In addition to hundreds of thousands in outside legal fees, a judgment for damages may run into six- figures. The EEOC requested, and got, a sweeping and intrusive injunction that will require significant expenditures in paperwork compliance costs and regular workplace sensitivity training for over one thousand employees.
To avert these consequences, we recommend that the company immediately issue the following rules for proper, non-gender-stereotyping workplace behavior. Employees should be informed that the rules apply across the board, to all-male, all-female, and mixed-sex offices and positions. The workplace must be cleansed of speech and actions that may be misper-ceived or twisted as reflecting gender stereotyping harassment.
NOTICE CONCERNING TITLE VII
To our Associates:
You are all aware of this company’s unwavering policy to prevent discrimination of any kind based on sex, race, religion or national origin. Because of a new court decision, we must now focus on eliminating same-sex “gender stereotyping” of any kind as well. This means that men may expose this company to liability for their speech and behavior in the presence of other men, and women in the presence of other women. Although these rules will apply throughout the company, you IRON-WORKERS have to take special notice. The rules apply throughout the workday, during breaks and lunch hours, and whenever two or more workers are gathered together.
1. At the most general level, all employees must refrain from any communication — spoken, written, or gesticulated — that may create any suggestion of “sexual stereotyping” or “gender-based bullying.” Please consider the broad implications of this prohibition, some of which follow. All employee interactions must be fully gender inclusive (or at least gender ambiguous). Careless phrases and jokes will not be tolerated if they may be interpreted to carry a stereotyping overtone.
2. No more banter about bodily functions, sexual or otherwise, or human physical appearance. Those who do not enjoy references to sweat, toilet humor, tattoos, tight jeans, muscles, or large beards may feel singled out as not “man enough” for such speech.
3. Do not discuss the appearance of women or any intimate sexual encounters, and do not refer to or use words that refer to sex in any way. This includes CUSS WORDS.
4. Do not swivel your hips, make obscene gestures or mimic “twerk-ing.”[1]
5. Avoid discussing topics that may be viewed as “non-inelusive”: bodybuilding, Boy Scouts, hunting, fishing, and riflery. Football and other “macho” sports may be an unwelcome subject to those who consider them boorishly aggressive.
6. Do not engage in any competitive activity, like lifting heavy objects, on the worksite. This can create a sense of unmanly inferiority for nonparticipants.
*484 7. Do not use gender-stereotyped nicknames or name-calling. Supervisors may not encourage you to work harder by saying “put your backs into it,” or “man up,” and terms like “ladies” or “sissies” will be grounds for immediate discipline.
8. Schoolyard humor, which is common at our jobsites to fill down-times and relieve boredom, raises sensitive issues. Some workers may be put off by jokes about personal grooming, scented deodorant, chest hair, or clothing as a form of gender hostility. Poking fun at a worker for drinking a diet soda, not being able to eat a raw jalapeno, using “Wet Ones” or “Purell” to clean himself, or calling someone a “wimp” or “wuss” or “geek” may get us sued and you in serious trouble.
9. Asinine locker room behavior is forbidden. Examples of this would be comments about anatomy, crude gestures, actions like towel-swatting, simulated sexual acts, and any behavior that would make someone ill at ease with his personal expression of his gender. Relieving yourself in the presence of others is forbidden; the company is reconfiguring all restrooms to prevent any worker from observing another worker’s bodily functions.
10. Avoid touching any coworker in any manner, except if asked to rescue the person from physical danger, and even then, avoid touching private areas.
PENALTIES: A first violation of these rules will result in a warning, a second violation in suspension without pay, and successive violations will result in termination. We will not call this a “three-strikes” policy, as that term might be interpreted to refer to the principally male sport of baseball. We need hardly explain that any worker terminated for same-sex gender stereotyping will have a hard time finding future employment.
The Company will conduct quarterly sensitivity sessions, where you can learn more about offensive gender stereotyping against fellow males and what you can do to prevent or correct it. As questions arise at any time, call our newly hired Sex Stereotype Counsellor in the HR Department.

. This dissent does not address or question in any way standards for racial harassment under Title VII.

. EEOC counsel acknowledged during en banc oral argument that Prime Minister Margaret Thatcher would have violated Title VII because she was known for chastising her male cabinet ministers, asking whether there was a “real” man among them.

. It is unsurprising that the EEOC should pursue a Title VII case with this ultimate result. The federal government recently promulgated procedures for government-subsidized universities that will dramatically curtail free speech on campus in the name of alleviating sex discrimination. See, e.g., Walter Olson, Sentence First, Verdict Afterward, Commentary Magazine, July 2013; Wendy Kaminer, No Sex Talk Allowed, The ATLANTIC, May 16, 2013, www.theatlantic.com/se xes/archive/2013/05/no-sex-talk-al-lowed/275782. Courts have struck down similar campus speech codes for violating the First Amendment. DeJohn v. Temple Univ., 537 F.3d 301, 313-20 (3d Cir.2008).

. The Price Waterhouse plurality's discussion of the "legal relevance” of sex stereotyping does not create a claim for a Title VII violation. Price Waterhouse v. Hopkins, 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989). Even if it attempted to do so, the plurality opinion is not controlling. Moreover, the plurality opinion uses sex stereotyping remarks by the male decision-makers only as evidence that they were motivated to discriminate against the female plaintiff. Id. The other members of the court agreed to the relevance of the remarks for that limited purpose alone. See, e.g., 490 U.S. at 294, 109 S.Ct. at 1813 (Kennedy, J., dissenting) ("Title VII creates no independent cause of action for sex stereotyping. '[Such] [e]vidence ... is, of course, quite relevant to the question of discriminatory intent.”).

. See, e.g., Price Waterhouse, 490 U.S. at 234-37, 109 S.Ct. at 1782-83.

. In Price Waterhouse, for instance, the plaintiff did not dress or act according to the male partners’ stereotyped notions of femininity. The Supreme Court unanimously characterized the evidence as "direct and substantial proof that an impermissible motive was relied upon.” Price Waterhouse, 490 U.S. at 290, 109 S.Ct. at 1812 (Kennedy, J. dissenting).

. Unfortunately, while it extensively quotes Wolfe’s testimony, the majority opinion curiously omits (via carefully placed ellipses) the parts relating to the generally crude atmosphere at the worksite. For instance, that Wolfe called his own son, who was also working there, a "queer,” is omitted.

. Comparable behavior in the presence of women, of course, would carry entirely different connotations.

. See also Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 291-92 (3d Cir.2009) (concluding that a male plaintiff who acknowledged that he speaks with a high voice, walks in an effeminate manner, and sits "the way a woman would sit” adduced sufficient evidence to submit his sex discrimination claim to a jury); Vickers v. Fairfield Med. Ctr., 453 F.3d 757, 764 (6th Cir.2006) ("Rather, his claim fails because Vickers has failed to allege that he did not conform to traditional gender stereotypes in any observable way at work.”); Medina v. Income Support Div., New Mexico, 413 F.3d 1131, 1135 (10th Cir.2005) (finding no sexual harassment based upon gender stereotyping when "there [wa]s no evidence ... that [the plaintiff] did not dress or behave like a stereotypical woman”); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874 (9th Cir.2001) (holding that male plaintiff who was attacked for, inter alia, walking and carrying his tray “like a woman” had established a viable sex discrimination claim).

. The court inadvertently heightened Dr. Gold's impact by admitting her videotaped deposition out of order at the conclusion of the evidence.

. Boh Brothers look prompt remedial action by separating Woods from Wolfe as soon as Duckworth heard of Wolfe’s behavior. Hockman v. Westward Commc’n, 407 F.3d 317, 329 (5th Cir.2004) ("We have often found that the employer took prompt remedial action as a matter of law.”) (citing several cases).

. See Twerk Definition, Oxford Dictionary, http://oxforddictionaries.com/us/defimtioii/ american_englisb/twerk (last visited Sept. 3, 2013). "[To] dance to popular music in a sexually provocative manner involving thrusting hip movements and a low, squatting stance[.]"