12-2493-cv
Kwan v. The Andalex Group LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

Argued: March 7, 2013      Decided: December 16, 2013
Docket No. 12-2493-cv

_____

ZANN KWAN,

*Plaintiff-Appellant*,

—v.—

THE ANDALEX GROUP LLC,

*Defendant-Appellee*.

_____

Before: B.D. PARKER AND LOHIER, Circuit Judges, and KOELTL,
District Judge.[*]

The plaintiff, Zann Kwan, appeals from the judgment of

the United States District Court for the Southern District of

New York dismissing her complaint. The District Court

(Katherine B. Forrest, Judge) granted summary judgment

dismissing the plaintiff's claims for discrimination,

retaliation, and hostile work environment, in violation of

federal and state discrimination laws, and failure to notify

_____

[*] The Honorable John G. Koeltl, of the United States District
Court for the Southern District of New York, sitting by
designation.

the plaintiff of her rights under the Consolidated Omnibus Budget Reconciliation Act of 1985, in violation of the Employee Retirement Income Security Act of 1974.

We affirm the judgment of the District Court in all respects, except we vacate the judgment dismissing the retaliation claims and remand as to those claims for further proceedings.

Judge Parker concurs in part and dissents in part in a separate opinion.

_____

EDWARD F. WESTFIELD, Edward F. Westfield, P.C., for Plaintiff-Appellant Zann Kwann.

A. MICHAEL WEBER AND JOSEPH E. FIELD, Littler Mendelson, P.C., for Defendant-Appellee The Andalex Group LLC.

_____

John G. Koeltl, District Judge:

The plaintiff, Zann Kwan, is a former employee of The Andalex Group LLC ("Andalex").  She appeals from a judgment of the United States District Court for the Southern District of New York dismissing her complaint.  The District Court (Forrest, J.), granted summary judgment dismissing the plaintiff's claims of discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; and

the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.[1]  The District Court also dismissed the plaintiff's claim that Andalex violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. by failing to notify her of her right to continuing health care coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1166 et seq.

On appeal, Kwan contends that she proffered sufficient evidence that she was subjected to a hostile work environment because of her gender and was retaliated against for complaining about gender discrimination.  Kwan also alleges that the District Court abused its discretion by denying her statutory penalties under COBRA.  For the reasons that follow, we affirm the judgment of the District Court except with respect to Kwan's retaliation claims, as to which there are genuine disputes as to material facts that preclude summary judgment.

---

[1]  Although the plaintiff alleged claims of discrimination on the basis of gender and national origin under Title VII, the NYSHRL, and the NYCHRL, those claims have not been pursued on appeal, and will therefore not be discussed in this opinion.

**BACKGROUND**

In reviewing the District Court's grant of summary judgment in favor of Andalex, "we construe the evidence in the light most favorable to the [plaintiff], drawing all reasonable inferences and resolving all ambiguities in [her] favor." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 118 (2d Cir. 2013) (citation and internal quotation marks omitted).

**I.**

Andalex is a small family-owned real estate management company specializing in large gaming and commercial properties. Allen Silverman is the founder and Chief Executive Officer. Allen's sons, Andrew and Alex, are the Chief Investment Officer and Chief Operations Officer respectively. Steven Marks is the Chief Financial Officer. During the relevant time period, April 2007 to September 2008, Andalex had approximately twenty to twenty-five employees.

**A.**

On April 9, 2007, Andalex hired the plaintiff to be Vice President of Acquisitions. Kwan was an at-will employee and was provided a six-figure salary, two weeks paid vacation,

-4-

health insurance, and was eligible for a year-end discretionary bonus. The plaintiff's primary duties at Andalex involved analyzing cash flows, preparing financial models and projections, and performing due diligence on investment properties. From April to August 2007, the plaintiff worked with Andrew Feder, the Managing Director of Acquisitions. Feder testified that Kwan's work product was "very good" and that he never had reason to criticize her competence or diligence. After Feder left Andalex in August 2007, Kwan reported directly to Steven Marks until she was terminated in September 2008. In November 2007, Andrew Silverman complimented Kwan's work and told her to "[k]eep up the good work." In December 2007, she received a bonus of $5,000.

On September 24, 2008, Andalex terminated Burton Garber, a male Andalex executive who had been with the company for several years. On September 25, 2008, Kwan left the office at 5:15 p.m., earlier than the standard departure time of 6:00 p.m. Andalex alleges that when Marks asked Kwan where she was going, she replied that she was leaving to play squash. Marks asked Kwan's status on a project and she said that she would work on it the following day and left the office. The plaintiff alleges that she received permission from Marks to leave early, that her leaving had no effect on her work, and

that September 25 was the first time she had ever left the office before 6:00 p.m.

The next morning, September 26, 2008, Marks met with Kwan and reprimanded her for leaving work early without permission. Amy Piecoro, the Director of Human Resources at Andalex, was present at the meeting. Although Marks testified that he had previously told the plaintiff not to leave early without permission and not to take long lunch breaks, Kwan testified that the September 26 meeting was the first time she had learned that there were set working hours at Andalex. Amy Piecoro testified that prior to September 26, 2008, she had never been told that Kwan was arriving late, leaving early, or taking long lunches. Later that day, Andrew Silverman fired Kwan.

## B.

According to Kwan, she was terminated about three weeks after she had complained to Alex Silverman that she was being discriminated against because of her gender. She alleges that she was fired because of her recent complaint about discrimination. Kwan testified that on September 3, 2008, she asked Alex Silverman why she was being discriminated against and treated differently from the men in the office with respect to salary increases and bonuses. Alex allegedly told

her that he and Andrew Silverman each speak with Allen Silverman about their "own men" and Allen then decides the increases and bonuses. About three weeks later, on September 26, 2008, Kwan was fired. Andalex claims that Andrew Silverman made the decision to terminate Kwan.[2] Alex Silverman denies that the September 3 conversation ever occurred.

Andalex has denied that it retaliated against the plaintiff. Indeed it has denied that the alleged complaint of gender discrimination ever occurred. Its explanations for the plaintiff's firing have, however, evolved over time. Andalex initially contended that its change in business focus to international investments made the plaintiff's skill set obsolete. Subsequently, it shifted to an explanation that the plaintiff's poor performance and bad behavior were the reasons for the termination.

---

[2] Andalex has not been consistent in its explanation of whether Andrew Silverman acted alone in deciding to terminate the plaintiff. Andalex's statement to the Equal Employment Opportunity Commission ("EEOC") indicates that Andrew Silverman and Steven Marks made the decision to terminate Kwan together. At another point, the EEOC statement says that "it was Mr. Marks['s] decision, approved by Andrew Silverman" to terminate Kwan. Alex Silverman testified that Andrew Silverman made the decision to terminate the plaintiff. Amy Piecoro testified that the decision to terminate Kwan was made by Andrew Silverman, Steven Marks, and William Kogan, Andalex's General Counsel.

In a letter dated November 19, 2008, Andalex's counsel explained that both Kwan and Garber were terminated because the business focus at Andalex had changed from domestic real estate to international gaming and hospitality:

> [Kwan's] skill set no longer matche[d] what Andalex need[ed] from her position. . . . As Andalex's business shifted from U.S.-based office properties to Latin American hospitality and gaming interests, Ms. Kwan's skill set became increasingly obsolete. . . . Ms. Kwan has no experience in the hospitality or gaming industry . . . which Andalex deems necessary for the direction its business is headed. Notably, only weeks ago, Andalex terminated a senior portfolio manager who is male, [Burton Garber,] because it similarly concluded that his skill set was not a good match for the company going forward.

The letter also claimed that Kwan was terminated because "she repeatedly took long lunches, arrived to the office late, left early, and generally made little effort to make herself valuable to the company as its business focus changed."

After Kwan filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), Andalex filed its Position Statement (the "Position Statement") on April 7, 2009. The introduction to the Position Statement explained that over the course of Kwan's employment, Andalex's "business changed dramatically." Andalex switched its focus from "the acquisition, development and management of commercial, retail and residential properties in the United States," at the time Kwan was hired, to "investments in Latin America and the

Caribbean" and a "business plan abroad." The Position Statement argued that "the termination of Ms. Kwan's employment [was] for reasons having nothing to do with her gender or national origin. Rather, her skill set no longer matched the needs of either Andalex or its foreign hospitality and gaming division." The introduction did not allege that Kwan's poor performance or behavioral problems contributed to the decision to terminate her.

The body of the Position Statement also focused almost exclusively on Andalex's change in business focus. Andalex represented that although it had attempted to "integrate Ms. Kwan into its foreign hospitality and gaming division, as domestic acquisitions came to a complete halt," Kwan was not suited to working on such transactions because she did not speak Spanish and lacked experience in this new area of business focus. Andalex represented that Kwan was unable to adapt to the change in business focus and that both she and Burton Garber had been terminated because of the change in business focus:

> While Ms. Kwan's performance in the context of the domestic real estate aspect of the operation was acceptable, she had failed and had been unable to make the transition to the foreign hospitality and gaming aspect of the business operation. In this context, . . . her employment was terminated . . . . During the same time frame, Burton Garber, a male, who is not of Asian nationality, was also notified of his termination based upon the disposition of

Andalex's domestic real estate portfolio and the growing focus on foreign business.

Andalex reiterated that "both Ms. Kwan's and Mr. Garber's employments were severed as a consequence of the company's shift from domestic real estate ownership and management to the foreign hospitality and gaming business." Andalex repeated this position:

> As noted above, the company's emphasis shifted from real estate in the United States to hospitality and gaming in Latin America and the Caribbean. Ms. Kwan did not have experience in hospitality or gaming acquisitions. She also did not speak Spanish. Her skills simply no longer fit in with the business of the company. . . . Ms. Kwan was never singled out for disparate treatment. Ms. Kwan conveniently fails to note that Mr. Garber's employment had been terminated around the same time that her employment had been terminated. His termination was for the same basic reasons as was Ms. Kwan.

In the argument section of its Position Statement, Andalex framed the dispute between the parties as "begin[ning] with whether Ms. Kwan was qualified to perform in the aftermath of the corporate changes in operations." The argument proceeded to tie Kwan and Garber together and claim that the change in business focus was the reason for their terminations:

> Andalex asserts that Ms. Kwan did not have the needed qualifications and abilities to transition with the changes in corporate focus. Ms. Kwan and Mr. Garber were both laid off at around the same time for the same business reasons. Andalex has presented a facially valid, independent and non-discriminatory basis for the actions taken.

Andalex's Position Statement also made brief reference to Kwan's performance in response to her claims that her performance was excellent, that she had always carried out her responsibilities, and that she had never received written or oral performance warnings. Andalex alleged there were "several instances in which Ms. Kwan's work product contained significant errors," including "at least one case [where her performance] adversely affected a transaction being negotiated with a global financial institution."

Andalex also alleged that Kwan's behavior contributed to its decision to terminate her. Andalex alleged that on at least two occasions Kwan had behaved inappropriately by taking photographs of Steven Marks despite his repeated requests that she stop. Andalex also claimed that "[t]oward the end of her employment, Ms. Kwan was taking long lunches and leaving the office early," and referred to her alleged early departure for a squash game.

Any fair reading of Andalex's Position Statement to the EEOC indicates that Andalex claimed that Kwan was fired primarily because its business focus had changed. Kwan was therefore terminated at about the same time as Garber, a male non-Asian, and Andalex could argue that the reason for both terminations was the same. This rationale undercut any

argument that Kwan was terminated because of discrimination based on her gender or national origin.

Andalex's explanation that Kwan was terminated because of a change in Andalex's business focus was undermined by Marks's testimony at his deposition. Marks testified that Andalex's business focus had already shifted from domestic real estate to international hospitality and gaming by the time the plaintiff began to work at Andalex. Marks testified that "at the time [Kwan] came in, [Andalex was] looking to acquire Curacao. . . . [and] some properties in Mexico. And [Andalex was] in the process of trying to raise equity with . . . JP Morgan to expand the hospitality and gaming business plan." Marks testified that although Burton Garber had been terminated because of the shift in business focus, Kwan was not terminated for that reason "[b]ecause she had been working on casino-related projects soon after she started." On the other hand, Andrew Silverman testified that the plaintiff's termination was the "[c]ulmination of her poor performance and the fact that . . . our business model had begun to change . . . ."

Andalex now alleges that Kwan's poor performance, illustrated by three discrete incidents, was the chief reason for her termination. Of the three incidents, only one was mentioned in Andalex's Position Statement before the EEOC.

The first instance, referred to briefly in Andalex's EEOC Position Statement, involved Kwan's error in preparing a financial model for possible equity funding. The project was reassigned. Andalex also alleges that Kwan was late in preparing a financial model for a casino acquisition in Argentina. Additionally, Andalex claims that Kwan was late in preparing a financial projection for a Mexican acquisition and that the projection contained significant errors. Neither the Argentina project, nor the Mexico project, was mentioned in the EEOC Position Statement.

Andalex also alleges that Kwan's behavior contributed to the decision to terminate her. Alex Silverman testified that Kwan had conducted herself unprofessionally at several business meetings. Marks also testified that Kwan did not abide by the standard work hours, getting into work late, leaving early, and taking long lunches.

## C.

The evidence with respect to Kwan's COBRA claim is as follows. After her termination, Kwan was entitled to receive notification under COBRA regarding her right to continue to receive health insurance benefits. As Director of Human Resources, Amy Piecoro was responsible for notifying Andalex's health insurance claims administrator, Paychex, Inc.

("Paychex"), about Kwan's termination, so that Paychex could send Kwan notification of her right to continue her health insurance benefits. Piecoro alleges that she completed and sent the COBRA employee data sheet to Paychex on September 30, 2008, but Paychex claims that it never received the form and therefore did not send the COBRA notification to Kwan.

Andalex claims that it discovered that Kwan had not received her COBRA notification form only after her attorney raised the issue in 2009. On October 12, 2009, more than a year after her termination, the plaintiff received notification of her COBRA rights from Paychex. Kwan then allegedly called Paychex several times in October and November 2009 to determine the amount she owed for her first premium check. The premium for the policy, stated in the notification form from Paychex, was $1,942.81 per month. On December 1, 2009, Paychex sent a second COBRA notice to the plaintiff offering Kwan participation in a different health plan, Healthnet, for a monthly premium of $990.24. Kwan testified that she could not afford the premium for coverage under the Healthnet plan. When the plaintiff sought clarification about the differences between the original and Healthnet plans, Andalex's broker allegedly told her that all further communications would "have to go through the attorneys." Kwan did not enroll in the Healthnet plan.

-14-

The plaintiff remained unemployed and without health insurance until she began new employment in Singapore in April 2010. Kwan testified that from the time her Andalex coverage lapsed in October 2008 to when she secured new insurance in 2010, she and her husband incurred unreimbursed medical expenses of "a few hundred dollars." Kwan alleges that she and her husband avoided and delayed seeking medical attention during the period they were without health insurance, including psychological counseling for the emotional distress associated with Andalex's alleged discriminatory treatment and her termination. Kwan was unable to locate any documents evidencing her medical expenses or demonstrating that she had delayed seeking medical attention for any ailments.

## II.

The District Court granted Andalex's motion for summary judgment and dismissed all of Kwan's claims.

The District Court dismissed the claims of discrimination and retaliation under Title VII for failure to establish a prima facie case under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The District Court went on to determine that even assuming the plaintiff had met her prima facie burden, Andalex had offered legitimate non-discriminatory reasons for her termination and the

-15-

plaintiff had failed to produce sufficient evidence to demonstrate that the reasons were a pretext for discrimination or retaliation.

The District Court dismissed Kwan's claims under the NYSHRL and NYCHRL for the same reasons it dismissed the Title VII claims and dismissed Kwan's COBRA claim because the plaintiff made no showing that she had been harmed by her lack of COBRA coverage.  In response to Andalex's motion for summary judgment, Kwan also argued that her complaint stated a claim for hostile work environment.  The District Court refused to consider Kwan's hostile work environment claim because it was first raised in response to the motion for summary judgment.

This appeal followed.


**DISCUSSION**

**I. Hostile Work Environment and Retaliation Claims**

We review de novo an award of summary judgment for the claims under Title VII, the NYSHRL, and the NYCHRL.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010); Dawson v. Bumble & Bumble, 398 F.3d 211, 216-17 (2d Cir. 2005).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine dispute of material fact "exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007) (citation omitted). The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Although summary judgment is proper where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005), there is a "need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent," Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

**A. Hostile Work Environment Claims**

Kwan's complaint does not assert a claim for hostile work environment and Kwan did not raise the prospect of such a

-17-

claim until her opposition to the motion for summary judgment. The District Court held that because the plaintiff had never asserted a claim of hostile work environment until her brief in opposition to the motion for summary judgment, it would not consider the claim.  We agree with the District Court and will not address the merits of that late-asserted claim.  See Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006); Syracuse Broad. Corp. v. Newhouse, 236 F.2d 522, 525 (2d Cir. 1956) (holding that district court was "justified" in "brush[ing] aside" further argument not alleged in complaint but raised for first time in opposition to summary judgment). The dismissal of the hostile work environment claim is therefore affirmed.

## B. Retaliation Claims

To prevail on a retaliation claim, "the plaintiff need not prove that her underlying complaint of discrimination had merit," Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012), but only that it was motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and internal quotation marks omitted). The good faith and reasonableness of Kwan's belief that she

was subjected to discrimination are not at issue on this appeal.

Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas, 411 U.S. at 802-04. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Dawson, 398 F.3d at 216-17; Reed, 95 F.3d at 1177.[3]

**1.**

Under the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of retaliation by showing 1) "participation in a protected activity"; 2) the defendant's knowledge of the protected activity; 3) "an adverse employment action"; and 4) "a causal connection between the protected activity and the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citation and internal quotation marks omitted). The plaintiff's burden of proof as to this first

---

[3] The plaintiff also brought a claim for retaliation under the NYCHRL. It is unclear whether and to what extent the McDonnell Douglas framework has been modified for claims under the NYCHRL. See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 n.8, 112 (2d Cir. 2013). It is unnecessary to resolve that issue in this case because to the extent that the defendant has failed to show it is entitled to summary judgment under McDonnell Douglas, it would not be entitled to summary judgment under the more expansive standard of the NYCHRL. See Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 181 (S.D.N.Y. 2011).

step "has been characterized as 'minimal' and '<u>de minimis</u>.'"
<u>Id.</u> (citations omitted).

The District Court erred when it held that the plaintiff failed to satisfy the knowledge and causation prongs of the prima facie case.

With respect to the knowledge prong, the District Court held that the plaintiff could not demonstrate Andalex's knowledge of her protected activity because Kwan had provided no evidence that Andrew Silverman had knowledge of Kwan's September 3 conversation with Alex Silverman when Andrew made the decision to terminate her. However, for purposes of a prima facie case, a plaintiff may rely on "general corporate knowledge" of her protected activity to establish the knowledge prong of the prima facie case.[4] <u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the

---

[4] To the extent Andalex argues that Kwan must demonstrate communication of Kwan's complaint from Alex Silverman to Andrew Silverman, Andalex confuses the "knowledge" and the causation prongs of the prima facie case requirement. Kwan does not argue that general corporate knowledge demonstrates <u>causation</u>, but rather argues that it demonstrates <u>knowledge</u>. Furthermore, while Andalex is correct that Kwan cannot satisfy the causation prong through mere corporate knowledge, as discussed below, Kwan demonstrates causation indirectly by the temporal proximity between her complaint and her termination, and does not rely on "general corporate knowledge" for the causation prong of the prima facie case. It should, however, be noted that Andrew Silverman testified that he consulted with his brother before terminating the plaintiff and Alex Silverman testified that he and Andrew had discussed terminating the plaintiff.

Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.") (citations omitted).  Here, the plaintiff made her September 3 complaint to Alex Silverman, an officer of the corporation.  This complaint was sufficient to impute to Andalex general corporate knowledge of the plaintiff's protected activity.  See Reed, 95 F.3d at 1178 (holding that a plaintiff's complaint to an officer of the company communicated her concerns to the company as a whole for purposes of the knowledge prong of the prima facie case); see also Summa v. Hofstra Univ., 708 F.3d 115, 125-26 (2d Cir. 2013).  Therefore, Kwan satisfied the knowledge prong of the prima facie case.

This case is a good illustration of why corporate knowledge is sufficient for purposes of a prima facie case of retaliation.  If that were not true, a simple denial by a corporate officer that the officer ever communicated the plaintiff's complaint, no matter how reasonable the inference of communication, would prevent the plaintiff from satisfying her prima facie case, despite the fact that the prima facie case requires only a de minimis showing.

The District Court also held that Kwan had not satisfied the causation prong because she had adduced no facts plausibly

suggesting that the September 3 conversation with Alex Silverman was causally related to her termination by Andrew Silverman.  However, even without direct evidence of causation, "a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action."  Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Summa, 708 F.3d at 127-128.

The Supreme Court recently held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar,  133 S. Ct. 2517, 2533 (2013).  However, the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity.

The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity. See Gorzynski, 596 F.3d at 110 ("Though this Court has not

-22-

drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.") (citations omitted); Gorman-Bakos, 252 F.3d at 554-55. Therefore, Kwan presented a prima facie case for her retaliation claims.

Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action. United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011). In this case, the defendant has proffered the plaintiff's poor work performance, bad behavior, and Andalex's change in business focus as the legitimate non-retaliatory reasons for the plaintiff's termination.

**2.**

Andalex's inconsistent and contradictory explanations for the plaintiff's termination, combined with the close temporal proximity between the September 3 conversation and Kwan's termination, are sufficient to create a genuine dispute of material fact as to whether Kwan's September 3 complaint of gender discrimination was a but-for cause of the plaintiff's termination.

-23-

Under the McDonnell Douglas framework, after the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). The plaintiff must then come forward with evidence that the defendant's proffered, non-retaliatory reason is a mere pretext for retaliation. Id.

The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a "but-for" cause of the adverse action, and not simply a "substantial" or "motivating" factor in the employer's decision. Nassar, 133 S. Ct. at 2526, 2533. However, "but-for" causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.[5]

---

[5] Prior to the Supreme Court's decision in Nassar, in order to demonstrate pretext, a plaintiff was only required to demonstrate that a retaliatory motive was "a substantial or motivating factor behind the adverse action[,]" Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation marks and citations omitted), rather than a "but-for" cause of the adverse action. In Nassar, the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," and "[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or

A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason. See, e.g., Byrnie v. Town of

---

actions of the employer." Nassar, 133 S. Ct. at 2533. However, a plaintiff's injury can have multiple "but-for" causes, each one of which may be sufficient to support liability. See Fowler V. Harper et al., 4 Harper, James and Gray on Torts § 20.2, at 100-101 (3d ed. 2007) ("Probably it cannot be said of any event that it has a single causal antecedent . . . .") (collecting cases); W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 264-66 (5th ed. 1984). Requiring proof that a prohibited consideration was a "but-for" cause of an adverse action does not equate to a burden to show that such consideration was the "sole" cause. See, e.g., Fagan v. U.S. Carpet Installation, Inc., 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (explaining that under the Age Discrimination in Employment Act "[t]he condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer's only consideration, but rather that the adverse employment actions would not have occurred without it.") (citation omitted).

In this case, the parties have put forward several alleged causes of the plaintiff's termination: retaliation, unsuitability of skills, poor performance, and inappropriate behavior. The determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact. A jury should eventually determine whether the plaintiff has proved by a preponderance of the evidence that she did in fact complain about discrimination and that she would not have been terminated if she had not complained about discrimination.

-25-

Cromwell, Bd. of Educ., 243 F.3d 93, 105-07 (2d Cir. 2001) (age and gender discrimination); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (age discrimination); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 156-57 (2d Cir. 1998) (disability discrimination), superseded by statute on other grounds as stated in Hilton v. Wright, 673 F.3d 120, 128 (2d Cir. 2012); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (age discrimination) (collecting cases).

In this case, Andalex offered shifting and somewhat inconsistent explanations for Kwan's termination. Andalex claimed throughout its Position Statement to the EEOC that Kwan and Burton Garber were both terminated largely because of Andalex's change in business focus from domestic real estate to international gaming and hospitality. This was a convenient explanation because it undercut any claim of gender or national origin discrimination. However, Marks, Andalex's CFO and Kwan's direct supervisor, later testified that Kwan, unlike Garber, was not terminated because of a shift in company focus. Marks's testimony directly contradicts Andalex's main representation to the EEOC. Moreover, while Kwan's poor performance on the Argentina and Mexico projects became critical parts of Andalex's argument that Kwan had performed poorly, those projects were never even mentioned to

the EEOC as reasons for Kwan's termination. "From such discrepancies a reasonable juror could infer that the explanations given by [Andalex] were pretextual." Ethan Allen, 44 F.3d at 120; see also Byrnie, 243 F.3d at 106.[6]

Kwan's evidence of Andalex's inconsistent explanations for her termination and the very close temporal proximity between her protected conduct and her termination are sufficient to create a triable issue of fact with regard to whether the September 3 complaint was a but-for cause of her termination. Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam). However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage. See

---

[6] The District Court addressed the inconsistencies in the defendant's stated reasons for the plaintiff's termination. The District Court noted Marks's denial that the shift in Andalex's business was a basis for the plaintiff's termination. The District Court found that Marks's statement was not inconsistent with Andrew Silverman's testimony that while the change in business was a factor that influenced his decision, the plaintiff's termination was due primarily to work performance issues. The District Court found these to be different but consistent explanations. This ignores that the thrust of the defendant's position before the EEOC was that the plaintiff was terminated because of a shift in the defendant's business, a rationale that was disowned by Marks, the plaintiff's direct supervisor.

Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination."); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000) ("[E]vidence satisfying the minimal McDonnell Douglas prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of [retaliation]; . . . the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove"); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the plaintiff's complaint and other circumstantial evidence is sufficient to raise an issue of fact with respect to pretext), abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Based on the discrepancies between the EEOC statement and subsequent testimony, a reasonable juror could infer that the explanation given by the defendant was pretextual, and that, coupled with the temporal proximity between the complaint and the termination, the September 3 complaint was a but-for cause

of Kwan's termination. Viewing the evidence in the light most favorable to the plaintiff, as required on a motion for summary judgment, there is sufficient evidence to require denial of the summary judgment motion on the claims for retaliation.[7]

## II. COBRA Claim

The plaintiff's final claim is based on Andalex's alleged failure to provide her with timely notice of her health insurance continuation coverage rights as required under COBRA. The District Court dismissed Kwan's COBRA claim because there was no evidence that the plaintiff suffered harm from her lack of coverage. Because Kwan has made no showing of bad faith by Andalex or prejudice resulting from the lack of notice, the District Court did not abuse its discretion in dismissing Kwan's claim for statutory penalties.

We review the District Court's determination that a plaintiff is not entitled to statutory penalties under 29 U.S.C. § 1132(c)(1) for abuse of discretion. See Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 290 (2d Cir. 2000). COBRA permits a qualifying employee to continue to

---

[7] Because the plaintiff's claims survive under the Nassar "but-for" standard, we do not decide whether the NYSHRL claim is affected by Nassar, which by its terms dealt only with retaliation in violation of Title VII.

receive health benefits at the group rate even after the termination of her employment. 29 U.S.C. §§ 1161(a), 1163(2). The statute specifies that "the employer . . . must notify the [health plan] administrator . . . within 30 days" of the employee's termination, id. § 1166(a)(2), and the administrator must then notify the employee of her rights to continuing coverage within 14 days, id. §§ 1166(a)(4), (c). Under ERISA, of which COBRA is a part, a plan administrator who fails to meet the COBRA notice requirements "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [$110][8] a day from the date of such failure or refusal . . . ." id. § 1132(c)(1); see also Deckard v. Interstate Bakeries Corp. (In re Interstate Bakeries Corp.), 704 F.3d 528, 534-37 (8th Cir. 2013).[9]

In assessing a claim for statutory penalties under ERISA, a district court should consider various factors, including "bad faith or intentional conduct on the part of the

---

[8] The statute provides for a civil penalty of up to $100 per day; however that amount has been increased to $110 per day. See Adjusted Civil Penalty Under Section 502(c)(1), 29 C.F.R. § 2575.502c-1; De Nicola v. Adelphi Acad., No. 05 Civ. 4231, 2006 WL 2844384, at *7 (E.D.N.Y. Sept. 29, 2006).

[9] We note that the parties have not raised the issue of whether Kwan is barred from recovery against Andalex because statutory penalties are only available against the plan administrator. See 29 U.S.C. § 1132(c)(1). We therefore decline to address that issue.

administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 90 (2d Cir. 2001) (quoting Pagovich v. Moskowitz, 865 F. Supp. 130, 137 (S.D.N.Y. 1994) (collecting cases)) (internal quotation marks omitted); see also In re Interstate Bakeries Corp., 704 F.3d at 534; De Nicola, 2006 WL 2844384, at *7-10; Chambers v. European Am. Bank & Trust Co., 601 F. Supp. 630, 638-39 (E.D.N.Y. 1985) (collecting cases) ("The weight of authority indicates that penalties are not imposed when a plaintiff has failed to demonstrate that his rights were harmed or otherwise prejudiced by the delay in his receipt of the information.").

Applying these factors, we conclude that the District Court did not abuse its discretion when it held that the plaintiff was not entitled to statutory penalties. Kwan presented no evidence of bad faith or intentional misconduct by Paychex or Andalex. See Devlin, 274 F.3d at 90; In re Interstate Bakeries Corp., 704 F.3d at 537.

Kwan has also failed to demonstrate prejudice resulting from the lack of coverage. By the plaintiff's own account, she incurred medical bills of only a few hundred dollars. Had she elected to receive coverage under COBRA, it is undisputed that she would have had to pay premiums in the range of

hundreds or thousands of dollars each month. The plaintiff therefore suffered no monetary loss from her failure to obtain insurance coverage until she obtained new employment. See Partridge v. HIP of Greater N.Y., No. 97 Civ. 0453, 2000 WL 827299, at *6 (S.D.N.Y. June 26, 2000), aff'd, No. 00-7920, 2001 WL 950682 (2d Cir. Aug. 14, 2001) (Summary Order). To the extent Kwan alleges that she would have sought healthcare had she had health insurance, her claim fails because she presented no evidence to support this allegation. See In re Interstate Bakeries Corp., 704 F.3d at 536. Therefore, the District Court acted well within its discretion when it dismissed the claim for statutory penalties because there was no showing of bad faith and Kwan suffered no harm.[10]

**CONCLUSION**

We have considered all of the arguments of the parties. To the extent not specifically addressed above, they are

---

[10] Kwan was also not entitled to actual damages. The only damages that she could recover are based on the several hundred dollars of medical bills she allegedly incurred. However, "[t]o be eligible to collect the [unreimbursed medical bills], the plaintiff would need to pay the COBRA premium payments." Rinaldo v. Grand Union Co., No. 89 Civ. 3850, 1995 WL 116418, at *2 (E.D.N.Y. Mar. 8, 1995) (citing 29 U.S.C. § 1162(2)(C)). "Where, as here, [the] plaintiff is in a better position not having exercised [her] rights under COBRA, there can be no actual damages." Id.; see also Soliman v. Shark Inc., No. 00 Civ. 9049, 2004 WL 1672458, at *5 (S.D.N.Y. July 27, 2004).

either moot or without merit.  For the reasons explained above, we **AFFIRM** the judgment of the District Court dismissing all claims, except we **VACATE** the judgment of the District Court dismissing the retaliation claims.  The case is **REMANDED** for further proceedings consistent with this opinion.

BARRINGTON D. PARKER, *Circuit Judge, concurring in part and dissenting in part*:

I concur in the majority's affirmance of the dismissal of Kwan's gender and national origin discrimination, hostile work environment, and COBRA claims. I would affirm the dismissal of her federal retaliation claim as well. District Judge Katherine B. Forrest concluded after a thorough and careful review that "no rational juror could find for the plaintiff in this case after comparing the overwhelming facts in the record supportive of legitimate business reasons for plaintiff's termination with what may only be characterized as cobbled together conduct allegedly supportive of . . . retaliation." In my view, she was correct.

I will assume for the moment that Kwan established a prima facie case of retaliation, and that Andalex proffered legitimate, performance-based reasons for her termination. As the majority notes, at that point, Kwan was obligated to come forward with sufficient evidence on the basis of which a reasonable jury could find that Andalex's performance-based reasons were pretextual. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). In other words, evidence that would permit a reasonable jury to find that she engaged in a protected activity, and that the activity, as opposed to the reasons proffered by Andalex, led to her termination. The bar is even higher in the wake of *Nassar*, as Kwan must now adduce facts sufficient to allow a reasonable trier of fact to find that retaliation was the "but for" cause of her termination. *Univ. Of Tx. Sw. Med.*

1

*Ctr. v. Nassar*, 133 S. Ct. 2514, 2533 (2013).[1]  Kwan failed to carry this burden.

The majority opinion hangs by a slender factual thread – that Kwan purports to have complained to Alex Silverman that she was being discriminated against, that she was fired three weeks later, and that her employer gave multiple reasons for her termination. Because more than one reason was offered, the majority concludes that Andalex's reasons were necessarily pretextual.  The problem with this analysis is that it obscures the failure of proof on Kwan's part that the myriad performance-based reasons for her discharge were "mere pretext for actual [retaliation]," *Weinstock*, 224 F.3d at 42, and that this supposed retaliation was the "but for" cause of her termination, *Nassar*, 133 S. Ct. at 2533.

Even accepting, for the purposes of argument, that Kwan has established that Andalex offered differing and thus apparently pretextual explanations for her termination, summary judgment would still be appropriate.  As we explained in *Schnabel v. Abramson*, even where a plaintiff has demonstrated pretext, rather than simply applying a *per se* rule precluding summary judgment for the defendant, we must instead employ a "case-by-case approach" and

---

[1]    The "but for" causation standard would apply to Kwan's Title VII and NYSHRL claims, but not to her retaliation claims under the NYCHRL.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir. 2013) (explaining that under the NYCHRL "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision.").  I decline to address Kwan's claims under the NYCHRL, because in the absence of a viable federal claim, I would decline to exercise supplemental jurisdiction over any remaining state or city law claims.  28 U.S.C. § 1367.

2

"examin[e] the entire record to determine whether the plaintiff could satisfy h[er] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted)). While *Schnabel* dealt with an age discrimination claim, this approach applies to retaliation claims as well. In conducting this "case-by-case" analysis, "[t]he relevant factors . . . 'include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'" *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (third alteration in original) (quoting *Reeves*, 530 U.S. at 148-49).

First, Kwan's prima facie case was particularly weak. To establish a prima facie case of retaliation under Title VII, she was obligated to demonstrate that: (1) she was engaged in an activity protected under Title VII; (2) her employer was aware of her participation in the protected activity; (3) the employer took adverse action against her; and (4) a causal connection existed between the protected activity and the adverse action. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993)).

Kwan addressed the knowledge and causation prongs in the most minimal way possible, relying exclusively on the legal fiction of general corporate knowledge and on a temporal proximity between her complaint and her discharge. Notably, she failed to

3

even allege, much less proffer evidence after taking extensive discovery, that the complaint she purportedly made to Alex Silverman was actually communicated to or known by the executives who terminated her, Andrew Silverman and Gregory Marks. This critical factual omission is telling.

Moreover, the probative value of her proof of pretext was minimal. As discussed below, Andalex consistently relied on the same facts and events justifying Kwan's termination at each stage of the proceedings. There is no evidence that Andalex shifted its position for strategic reasons because, for example, new evidence undermined a prior asserted justification, s*ee Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994). To the extent its position has shifted at all (and I would find, for the reasons discussed below, that it has not), that shift merely reflected a change in the description it applied to a consistent set of facts.

In any event, Andalex presented ample evidence of legitimate, non-retaliatory reasons for its termination of Kwan. Andalex established that, consistent with their shift in business strategy, another employee who held a similar position, but also lacked the skills and experiences Andalex was seeking, was terminated three days before Kwan. In addition, Andalex demonstrated that Kwan was replaced by a woman with the Spanish language skills that Kwan lacked.

4

In addition, Andalex documented a host of performance based reasons why Kwan was fired.  For example, in December 2007, in connection with a casino acquisition project in Argentina, Marks asked Kwan to prepare a financial model over the weekend so that it could be checked Monday morning in preparation for a business trip that evening.  Kwan avoided working over the weekend and claimed that she needed help translating the Spanish-language documents.  Although another employee, fluent in Spanish, offered to help Kwan complete the work on Sunday, she declined.  Kwan began work on the model on Monday morning, and was unable to complete the assignment in a timely fashion, forcing the executives to travel without the model.

In October 2007, Kwan was asked to update a financial model for a pending deal by adding and removing certain projected acquisitions.  Marks found numerous errors in Kwan's work product and was forced to assign the project to a more junior analyst to be completed properly.  Kwan does not deny that the incident occurred, but only denies that she was ever told of this incident.

In September 2008, Marks asked Kwan to prepare a financial projection for a deal involving the acquisition of a chain of Mexican casinos.  Kwan made errors in the model that led to grossly overstated losses.  After a potential investor noticed the mistake and contacted Andrew Silverman to ask why Andalex was recommending an investment that was projected to have a significant loss, Marks and another employee were forced to redo Kwan's work and to suffer the obvious embarrassment to the

5

company's reputation. In response, Kwan denies that she was ever told she had made "errors," and argues that Marks and the other employee merely were "simplifying" the formulae, rather than redoing her work.

In his deposition, Andrew Silverman noted that he received feedback from other employees that Kwan had conducted herself in an unprofessional manner during several business meetings, including inappropriately taking photos of Marks on two occasions. Further, at the end of her employment Kwan was taking long lunches and leaving the office early even when work remained unfinished. As a result, Marks required Kwan to let him know before she left so that he could make sure there was no additional work that needed to be completed, but she regularly failed to do so. On the day before her termination, Marks observed Kwan leaving the office around 5:00 p.m even though she had a looming deadline.

Kwan denies taking long lunches, and provides a different explanation for leaving early the day before her termination and avers that she was a competent employee. However, her subjective disagreement with her employer's assessment of her performance is not sufficient to demonstrate retaliatory intent and defeat summary judgement. *Ricks v. Conde Nast Publ'ns*, 6 F. App'x 74, 78 (2d Cir. 2001) (summary order); *see also Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 315 (2d Cir. 1997) ("'This court does not sit as a super-personnel department that reexamines an entity's business decisions.'" (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). In any event, in light of this abundance of

largely unrefuted evidence of poor performance, no reasonable trier of fact could conclude that retaliation was the "but for "reason for Kwan's termination.

But we need not even reach the foregoing analysis, however, as I would find that Kwan has neither demonstrated that Andalex shifted positions, nor, as a result, pretext. The majority finds that she has done so by characterizing Andalex's position as shifting between its Position Statement in the Equal Employment Opportunity Commission ("EEOC") proceedings and this lawsuit. As our precedent recognizes, however, it is not uncommon for an employer to have multiple reasons for terminating an employee, and we have held that where the employer offers "variations . . . on the same theme rather than separate inconsistent justifications," there is not sufficient evidence of pretext to preclude the entry of summary judgment. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 20 (2d Cir. 2007).

In *Roge*, after the employer cited, among other things, the lack of work for the plaintiff-employee and its own business restructuring as reasons for the employee's termination, the employee argued that those two reasons were inconsistent and thus pretextual. 257 F.3d at 169-70. We disagreed, finding that the business restructuring was motivated by the lack of work, and thus that these two explanations were "variations . . . on the same theme." *Id.* at 170. Similarly, in *Timothy*, we found that the employer's various and shifting justifications for an employee's

7

repeated reassignments were not pretextual because they "share[d] a consistent theme of a[n employer] facing the double bind of a severe labor shortage and desperate financial straits that is trying to deal with this terrible situation through reorganization and reassignments." 233 F. App'x at 20.

Rather than "inconsistent explanations," as the majority asserts, Andalex has offered complementary justifications for Kwan's discharge: a shift in the company's business focus as well as her poor performance – that are part of the same theme and which support her termination. These rationales, and the key facts supporting them, are consistently reflected in Andalex's submissions.

In a pre-litigation letter, Andalex relied not only on the fact that its "business shifted," but also on Kwan's poor performance to justify her termination. Andalex explained that as a result of the shift in business focus Kwan's "skill set became increasingly obsolete," and that "[Kwan] repeatedly took long lunches, arrived to the office late, left early, and generally made little effort to make herself valuable to the company as its business focus changed."

Similarly, in Andalex's Position Statement before the EEOC, it explained that its "business changed dramatically," that "[Kwan's] skill set no longer matched the needs" of the company, and that "she had failed and had been unable to make the transition to the foreign hospitality and gaming aspect of the business operation," as evidenced by Andrew Silverman's recollection of "several instances

8

in which [her] work product contained significant errors, which in at least one case adversely affected a transaction being negotiated with a global financial institution." The EEOC Position Statement also recounted the instances where Kwan had inappropriately photographed Marks during business meetings, as well as her "long lunches" and penchant for "leaving the office early" in violation of Marks' requirement that he first check in with him, including the specific instance on the day before she was terminated.

The majority's narrow focus on a single answer Marks gave in his deposition, disputing that Kwan was fired due to the business shift, ignores the other facts that Marks relied upon. Like both Andalex's pre-litigation letter and EEOC Position Statement, Marks's deposition testimony described a number of specific projects in which Kwan had performed poorly, both in the quality of her work, and her unwillingness or inability to complete her work in a timely fashion. The fact that in one answer Marks characterized these events as strictly performance problems does not change the reality that Andalex and its executives have advanced the same facts justifying Kwan's termination throughout these proceedings.

In its summary judgment brief, Andalex also relied upon these same facts to support its argument that the combination of the company's shifting business focus and Kwan's poor performance justified her termination. In the brief, Andalex explained that the decision to terminate Kwan was "a culmination of ongoing issues that were brought to [its] attention by a number of people regarding the quality and accuracy of Kwan's work product, the level of her

9

performance, and her attitude." The brief reviewed the instances where Kwan's work was deficient or late to the detriment of the company, and where she resisted working the hours necessary to finish her work before deadlines, or left the office early despite pressing responsibilities.

Further, there is no evidence that Andalex ever altered its rationale because new evidence undermined a previously asserted justification for her discharge, s*ee Carlton*, 202 F.3d at 137, and *Ethan Allen*, 44 F.3d at 120, nor does the record establish that the allegedly shifting reasons Andalex has asserted are in fact contradictory. Rather, the shift in business focus and Kwan's poor performance are complementary — indeed the shift in focus may in fact be a cause of at least some of Kwan's performance problems. Therefore, to the extent one or the other is more heavily emphasized at times, that does not mean that they are not part of a consistent theme. Consequently, Kwan failed to demonstrate that Andalex shifted its positions, let alone that such a shift rendered its proffered, legitimate reasons for her termination pretextual.

The only remaining evidence of pretext offered by Kwan is the temporal proximity of her alleged complaint and her termination. We have, however, repeatedly held that temporal proximity alone is insufficient as a matter of law to defeat summary judgment. *See, e.g.*, *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (affirming district court's grant of summary judgment to defendant where plaintiff relied only upon temporal proximity and made no showing of pretext). Whatever modest probative value temporal

10

proximity might have in this case is washed away by the facts that Plaintiff did not offer any evidence to suggest that the decision-makers who fired her knew about the complaints she allegedly made and that Plaintiff did not produce any evidence to undermine Andalex's position that her performance was demonstrably poor and incompatible with its shift in business focus.

## CONCLUSION

I would affirm the judgment of the district court in its entirety.